**United States District Court**
For the Northern District of California

1

2 **NOT FOR CITATION**

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 SPIRO ZOGRAFOS,

8 Plaintiff,                                    No. C 05-3881 PJH

9 v.                                            **ORDER GRANTING IN PART AND
                                                DENIING IN PART DEFENDANT'S**

10                                              **MOTION FOR SUMMARY JUDGMENT**
CITY AND COUNTY OF SAN

11 FRANCISCO, et al;

12 Defendants.
   _____/

13

14          Defendant City and County of San Francisco's ("CCSF" or the "City") motion for

15 summary judgment as to all claims in this case came on for hearing before the court on

   November 22, 2006.[1]  CCSF appeared through its counsel, Jonathan Rolnick; and plaintiff
16
   Spiro Zografos ("Zografos") appeared through his counsel, Thomas Duckworth.  Having
17
   read the papers filed in conjunction with the motion and carefully considered the arguments
18
   and the relevant legal authority, for the reasons that follow, the court GRANTS CCSF's
19
   motion in part and DENIES it in part.
20
                                **PROCEDURAL HISTORY**
21
            This is an action brought under 42 U.S.C. § 1983.  Zografos worked for the City's
22
   Municipal Railway ("MUNI"), and claims that CCSF violated his constitutional right to due
23
   process in connection with his termination following a fight with co-worker and defendant
24
   Morey.
25

26 _____

            [1]This order does not dispose of the claims brought against defendant, Kenneth Morey
27 ("Morey") in his individual capacity.  Morey retained separate representation, and has filed
   counterclaims.  Morey did not join in CCSF's motion or file a motion of his own, and the
28 dispositive motion cut-off date has passed.

United States District Court

For the Northern District of California

1   Zografos filed the complaint in this case, which alleged nine claims, including one

2   federal and eight state law claims, in state court on August 10, 2005.  Defendants removed

3   the case to this court on September 26, 2005.  On October 10, 2006, the parties stipulated

4   to dismiss four of the eight state law claims, leaving four state law and one federal claim.

5   The remaining claims are set forth below.  However, as CCSF correctly noted in its motion

6   papers, Zografos' single section 1983 claim actually includes four separate claims.  Thus,

7   there are eight claims at issue in this motion.

8   The claims are as follows:

9   **Section 1983 Claims**

10   (1) Violation of Zografos' procedural due process rights under the Fifth and

11   Fourteenth Amendments:  in terminating Zografos' employment, CCSF violated

12   Zografos' *property interest* in public employment;

13   (2) Violation of Zografos' procedural due process rights under the Fifth and

14   Fourteenth Amendments:  in terminating Zografos' employment, CCSF violated

15   Zografos' *liberty interest*;

16   (3) Violation of Zografos' *substantive* due process rights under the Fifth and

17   Fourteenth Amendments in terminating his employment;

18   (4) Violation of Zografos' First and Fourteenth Amendment Rights: in terminating

19   his employment, CCSF retaliated against Zografos for engaging in protected

20   speech;

21   **State Law Claims**

22   (5) Negligent supervision;

23   (6) Negligent retention;

24   (7) Intentional infliction of emotional distress; and

25   (8) Negligent infliction of emotional distress.

26   **FACTUAL BACKGROUND**

27   In support of its motion, CCSF submitted numerous declarations and exhibits,

28   2

United States District Court

For the Northern District of California

1   including those from Don Gee, Diana Buchbinder, Vernon Crawley, and attorney Jonathan

2   Rolnick.  In opposition, Zografos has submitted his own declaration and exhibits and that of

3   his attorney Thomas Duckworth.

4        Zografos was hired in June 1998 as an automotive machinist for MUNI, and worked

5   there for over six years until he was terminated in late 2004 following an October 29, 2004

6   altercation with defendant Morey, who was also employed by MUNI.  Throughout his

7   employment, Zografos worked at a repair shop in the Woods Maintenance Division

8   ("Woods").  He became a permanent full-time employee there in July 1999.  Zografos was

9   also a machinist union member, and from 1999-2003, Zografos served as the union

10  steward.

11       Zografos' employment was governed in part by the terms of a memorandum of

12  understanding ("MOU") between his union and the City.  At the time Zografos was hired, he

13  signed an acknowledgment of receipt of the City's policies prohibiting workplace violence.

14       Beginning in early 2002, Zografos lodged a number of complaints with MUNI

15  management regarding a variety of workplace issues.  Zografos made his first and only

16  complaints to Cal/OSHA in February 2002 regarding safety issues at Woods – including

17  dust in the brake repair room ventilation system, the fire alarm and suppression system,

18  and the hydraulic lifts.  Zografos made the complaint via telephone, but the verbal

19  complaint followed a written complaint that he had made directly to MUNI regarding the

20  same issues.  Zografos conceded that the only colleague that he told about his call to

21  Cal/OSHA was co-worker, Steve Haver.  Zografos Depo. at 85-86.  Haver had also

22  complained to defendant regarding health and safety issues at Woods.

23       Soon after the February 2002 complaint, an OSHA investigator inspected Woods,

24  and the Woods superintendent at the time, Carl Ware, asked Zografos to escort the

25  inspector around the facility.[2]   As a result, OSHA issued several citations against Woods.

26  _____

27       [2]Ware was the superintendent at Woods facility until approximately February 14, 2004.

28                                        3

United States District Court

For the Northern District of California

1    CCSF claims that MUNI repaired the cited defects.

2        Zografos then claims that following the OSHA site inspection, several colleagues

3    and Woods management became hostile toward him as a result of "rumors" that he had

4    complained to OSHA.  Zografos claims that it was "common knowledge" among the Woods

5    employees and management that he had complained.  There is some dispute regarding his

6    colleagues' knowledge of the complaints.

7        In terms of management's knowledge, Zografos claims that management employees

8    Carl Ware, Kenneth Sapp,[3] and Don Gee not only knew that he was responsible for the

9    complaint, but were upset about it.  The evidence in support of Zografos' contention that

10   management was upset comes primarily from the deposition testimony of Zografos'

11   immediate supervisor, Alfred Frendo.[4]  It is disputed in part by Gee's declaration and

12   deposition testimony.  Gee attested that he had no knowledge that Zografos contacted

13   OSHA until Zografos' termination.  Gee Decl. at pars. 21-25.  However, Zografos asserts

14   that Frendo actually wrote Gee a letter in January 2002 in response to what he believed

15   were negative comments from Ware regarding  Zografos' complaints, and defended

16   Zografos' actions, which Frendo believed were in the interests of health and safety at the

17   Woods facility.  Sapp acknowledged that he heard a rumor that Zografos was involved in

18   the OSHA complaint.

19       However, it is undisputed that following Zografos' complaint to OSHA, he also

20   lodged with MUNI several complaints against his co-workers, and complaints regarding

21   other safety issues at Woods.  These complaints concerned his co-workers' alleged

22   harassment and threats, in addition to complaints regarding his co-workers' performance

23   (e.g., employees sleeping on the job, leaving work early while still on the clock, and locking

24   _____

25       [3]Sapp was the acting superintendent at Woods on October 29, 2004, while Williamson
     was on vacation.

26

27       [4]Frendo was Zografos' immediate supervisor at Woods facility until 2003, and reported
     himself to Gee, Ware, and Sapp.

28                                          4

United States District Court

For the Northern District of California

1    the facility's exit door).  It is also undisputed that MUNI management was well aware of

2    these complaints.

3         A chronology of events follows.  In May 2002, Zografos complained to MUNI

4    regarding the lack of protective steel-toed shoes, which MUNI later provided.

5         The tension at the Woods facility appears to have heated up around summer 2002.

6    During that time, Morey approached Zografos and told him he shouldn't worry so much.

7    Zografos reported that his car was vandalized at work to Frendo, and asked that the fire

8    exit door remain closed so that employees could not enter and exit the workshop.  Haver

9    also filed a grievance with MUNI's human resources department regarding harassment by

10   Woods employees.

11        At the end of 2002, Morey and other Woods co-workers made comments about

12   Zografos' family, and called Zografos names.  The harassment continued into 2003.  In

13   early 2003,  Zografos was threatened by another co-worker, Ron Curley, who threatened to

14   "kick his ass;" Morey poured liquid into Zografos' work stereo; Zografos' car was vandalized

15   at work again; and someone put stickers on Zografos' toolbox and greased its handle.

16   During this time period, Zografos complained to Frendo.

17        In March 2003, Gee became aware of a "constant string of complaints" from Woods

18   employees about each other.  Gee and Ware decided that management intervention was

19   going to be necessary.  Gee asked Ware and Frendo to investigate the complaints.

20        On March 17, 2003, Ware sent Frendo a memo regarding complaints by Woods

21   employees against Zografos, alleging that Zografos had been harassing them.  Two days

22   later, on March 19, 2003, Zografos complained in writing about harassment at work to

23   Frendo, who provided copies to Ware and human resources.  Subsequently, on March 20,

24   2003**,** Frendo wrote Ware an interoffice memo stating that he was unaware of harassment

25   at Woods by anyone.

26        Around May-June 2003, Ware suspected that Frendo's report of no harassment was

27   inaccurate.  Ware notified Zografos in writing that Frendo was being trained in how to

28                                                    5

United States District Court

For the Northern District of California

respond to harassment, and that MUNI was making changes regarding the supervision at Woods. Ware subsequently removed Frendo from his supervisory position at Woods, and replaced him with Andy Andrich.  Ware also met with all Woods employees regarding harassment complaints, at which time Zografos and Curley shook hands and agreed to resolve their differences.  However, sometime around this time, in May 2003, Zografos complained again to Andrich regarding his car being vandalized.

Beginning in May- July 2003, MUNI's Equal Employment Opportunity ("EEO") section of the human resources division conducted three anti-violence training sessions at Woods.  The EEO began conducting the training because it was clear that the Woods facility suffered from ongoing tension, and that the unit was divided into two or three different groups who constantly complained to management about harassment and threats from each other.  Crawley Decl. at par. 20.[5]

Meanwhile, on July 1, 2003, Zografos filed a complaint with MUNI's EEO section alleging continuous harassment and also retaliation for testifying against Sapp, then a Woods supervisor, at an unrelated EEO proceeding.

On September 30, 2003, the EEO section notified Woods management, specifically Ware, regarding Zografos' July 1, 2003 EEO complaint.  That letter instructed management that it was prohibited from retaliating against Zografos in any way.

The problems at Woods continued into 2004 in spite of the training and attempts to redress the tensions.  In January 2004, co-worker Dave Lopez called Zografos a "kiss ass."  Zografos complained to Andrich, and contends nothing was done.  On February 14, 2004, Ware retired, and Paul Williamson became the new superintendent at Woods.  In July 2004,  Williamson moved his office down into the repair unit in order to monitor employee conduct.

Later that summer, on August 27, 2004, Morey and Zografos had another

_____

[5]Crawley was the manager of MUNI's EEO section.

United States District Court

For the Northern District of California

altercation.  Zografos contends that Morey threatened Zografos to go outside and fight him.  Haver notified Williamson.  Williamson sent Zografos home without pay that day.

On August 30, 2004, Williamson recommended that two Woods employees be reassigned to other work sites in the city due to the hostile climate in the facility, but did not mention the workers to be transferred by name.  Buchbinder Decl., Exh. I.  Diana Buchbinder, MUNI's deputy director of employee and labor relations, then spoke with Williamson on the phone, who confirmed that the employees he sought to transfer were Morey and Zografos.  Buchbinder advised Williamson that the workplace tensions needed to be resolved, and that MUNI could not simply move problematic employees to another department.  Buchbinder Decl. at par. 9.  She advised Williamson to continue monitoring the situation and to make EEO counseling available to the employees.  *Id.*  If those methods were unsuccessful, then disciplinary measures would be necessary.  *Id.*

On October 18, 2004, Zografos alerted Williamson that Morey was taunting him again.  Williamson allegedly responded that "maybe Morey wants to go trick or treating with Zografos."  On October 28, 2004, the day before the incident that led to Zografos' termination, Morey allegedly pursued Zografos in his car on the freeway, and made threatening gestures for Zografos to pull over.

On the morning of October 29, 2004, Morey and Zografos got into a fight at work, which resulted in Zografos being taken by ambulance to the hospital with an injured jaw, concussion, back and shoulder injuries, and internal and external bruising.  Zografos and Morey dispute who started the fight.  Zografos contends that the fight began after Morey's taunting.

Gee learned of the fight, and asked Sapp, acting Woods superintendent, to investigate the incident.  Sapp interviewed a number of employees who he believed might have information, but the employees denied seeing anything.  Sapp notified Gee that he did not believe the employees were being truthful.  Gee then spoke to several of the witnesses himself, and required them to sign witness statements.  He reviewed the statements, and

7

1    also suspected that the employees were not being honest with their denials.  Nevertheless,

2    Gee asserts that he concluded that the incident was "an act of mutual combat" upon

3    learning that neither Morey nor Zografos were taking responsibility for the incident.  Gee

4    then recommended that both Zografos and Morey be terminated.[6]

5         Meanwhile, another human resources employee, Mabel Sha, advised Buchbinder of

6    the fight.  Buchbinder asked Sha to investigate the matter, and place Zografos and Morey

7    on unpaid administrative leave, the standard MUNI procedure in cases of workplace

8    violence.  Buchbinder Decl. at par. 10.

9         On November 1, 2004, Zografos was advised by letter that his pre-termination *Skelly*

10   hearing was set for November 16, 2004.  Buchbinder Decl., Exh. J.  In that letter, CCSF

11   advised Zografos that he had a right to have representation at the hearing.  It also advised

12   him that:

13        Once the investigation is completed, and charges, if any, are formalized, you
          will be provided with a copy of the charges, any additional supporting
14        documentation, and evidence that the department intends to use to support
          the charges.  You will be given an opportunity to respond to the charges.
15   *Id.*

16        The pre-termination, or *Skelly* hearing, took place on November 17, 2004.  Zografos,

17   his brother and representative, Taso Zografos, Sapp, acting superintendent, Parveen

18   Boparai, senior personnel analyst, Mabel Sha, senior personnel officer, and Gee were

19   present.  At that hearing, Zografos was advised that he was being charged with

20   Mistreatment of Persons, Violence in the Work Place and Assault.  Buchbinder Decl., Exh.

21   L.  Apparently, Zografos was provided with "documentation supporting the charges," *id.*,

22   which Zografos claims included only the witness statements, in which the witnesses denied

23   having seen anything.  Zografos was also advised that he could respond to the charges at

24   the hearing or in writing, and request a second hearing.  *Id.*

25        On November 21, 2004, Zografos responded to the charges in a letter addressed to

26   _____

27        [6]At some point, at least a couple of the witnesses changed their stories.  Gee asserts
     this would not have changed his recommendation, though.

28                                          8

United States District Court

For the Northern District of California

1    Mabel Sha, and cc'ed to Gee.[7]  *See* Zografos Decl., Exh. E.  In that letter, Zografos

2    complained that at the November 17, 2004 hearing, MUNI did not supply him with an

3    explanation or details regarding the specific charges.  Zografos then responded to

4    questions propounded at the hearing, and provided his version of the events of October 29,

5    2004.  In sum, Zografos alleged that Morey struck him first in his head and face, and then

6    continued to strike him repeatedly, and that he had difficulty defending himself because his

7    hands were in his pockets.  Zografos asserted that he ended up on the floor, and tried to

8    pull Morey down to prevent Morey from kicking him.  Zografos did not know what motivated

9    Morey to attack him.  *Id.*

10        Thereafter, on November 30, 2004, Gee recommended in writing termination of

11   Zografos.  Buchbinder Decl., Exh. L.  Ultimately, Gee recommended termination based on

12   the "evidence and testimony at the hearing" which "established that: 1) Zografos fought on

13   MUNI property; and 2) Zografos caused false statements to be entered into the

14   investigation."  *Id.*

15        Buchbinder approved Zografos' dismissal, and notified him of the decision in a

16   December 8, 2004 letter.  On December 14, 2004, Zografos notified Buchbinder that he

17   wished to appeal the dismissal.  Thereafter, Buchbinder confirmed in writing that Zografos

18   was appealing the dismissal, but some confusion regarding whether he was representing

19   himself or not followed.  Buchbinder asked Zografos to confirm whether or not he would be

20   represented at the hearing, and she also set a hearing date for January 31, 2005 with

21   hearing officer Susan Mosk.  A series of letters between Zografos and Buchbinder followed,

22   in addition to several extensions of the appeal hearing date.  On February 2, 2005,

23   Zografos notified Buchbinder that current counsel, Duckworth, would represent him.

24   Buchbinder contacted Duckworth, and they rescheduled the hearing for March 4, 2005.

25        On March 3, 2005, Duckworth advised Buchbinder that Zografos was withdrawing

26   _____

27        [7]CCSF states that the letter was to Michael Burns, the executive director of MUNI, but
     the citations are not to any such letter.   CCSF appears to be mistaken.

28                                          9

1   his appeal because he felt that the hearing would not be fair.  Thereafter, Buchbinder

2   confirmed in a letter to Duckworth that the hearing was cancelled and that "by withdrawing

3   his appeal, Zografos is accepting the dismissal decision communicated to him in December

4   2004, and that final documentation will be forthcoming."  *Id.* at Exh. EE.  She also noted

5   that her conversation with Duckworth on the morning of March 3, 2005 was "the first time

6   any concerns have been raised regarding a fair and impartial hearing."  *Id.*

**DISCUSSION**

7

8   **A.    Legal Standards**

9           Summary judgment is appropriate when there is no genuine issue as to material

10  facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

11  Material facts are those that might affect the outcome of the case.  *Anderson v. Liberty*

12  *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

13  is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

14          A party seeking summary judgment bears the initial burden of informing the court of

15  the basis for its motion, and of identifying those portions of the pleadings and discovery

16  responses that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*

17  *v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

18  at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

19  than for the moving party.  On an issue where the nonmoving party will bear the burden of

20  proof at trial, the moving party can prevail merely by pointing out to the district court that

21  there is an absence of evidence to support the nonmoving party's case.  *Id.*  If the moving

22  party meets its initial burden, the opposing party must then set forth specific facts showing

23  that there is some genuine issue for trial in order to defeat the motion.  *See* Fed. R. Civ. P.

24  56(e); *Anderson*, 477 U.S. at 250.

25          "To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least

26  some significant probative evidence tending to support the complaint."  *Smolen v. Deloitte,*

27  *Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted).  The court must

28                                                          10

United States District Court

For the Northern District of California

1  view the evidence in the light most favorable to the non-moving party.  *United States v. City*

2  *of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003).  The court must not weigh the evidence or

3  determine the truth of the matter, but only determine whether there is a genuine issue for

4  trial.  *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).  If the nonmoving party

5  fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment

6  as a matter of law."  *Celotex*, 477 U.S. at 323.  Regardless of whether plaintiff or defendant

7  is the moving party, each party must "establish the existence of the elements essential to

8  [its] case, and on which [it] will bear the burden of proof at trial."  *Id.* at 322.

9  **B.      Defendant's Motion**

10        1.      Section 1983 Procedural Due Process Claims: Property and Liberty Interests

11        The Fourteenth Amendment's guarantee of procedural due process applies when a

12  constitutionally protected liberty or property interest is at stake.  *Vanelli v. Reynolds School*

13  *Dist.*, 667 F.2d 773, 776 (9th Cir. 1982) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569

14  (1972)).  A procedural due process claim has two distinct elements: (1) a deprivation of a

15  constitutionally protected liberty or property interest; and (2) a denial of adequate

16  procedural protections.  *Brewster v. Board of Educ.*, 149 F.3d 971, 982 (9th Cir. 1998).

17        The Fourteenth Amendment's due process guarantee applies to public employees

18  who have a "property interest" in the terms or conditions of their employment.  *Roth*, 408

19  U.S. at 576.  That interest is established "by existing rules or understandings that stem

20  from an independent source such as state law rules or understandings that secure certain

21  benefits and that support claims of entitlement to those benefits."  *Id.* at 577.

22         What procedures are required under the Due Process Clause depends on the

23  circumstances of the case.  *Brewster*, 149 F.3d at 983.  "The determination of what

24  procedures satisfy due process in a given situation depends upon an analysis of the

25  particular case in accordance with the three-part balancing test outlined in *Matthews v.*

26  *Eldridge*, 424 U.S. 319 (1976)."  *Id.*  In *Matthews*, the Supreme Court held that the factors

27  to consider include the private interest that will be affected, the risk of an erroneous

28                                                                11

deprivation of that interest through the procedures used, and the fiscal and administrative burdens that any additional procedural requirements would entail. *Vanelli*, 667 F.2d at 778-79 (citing *Matthews*, 424 U.S. at 335).

"The root requirement of the Due Process Clause is that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Clements v. Airport Authority*, 69 F.3d 321, 331 (9th Cir. 1995) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)). Although the pre-termination hearing need not be elaborate, some kind of hearing must be afforded the employee prior to termination. *Id.* A plaintiff need only be accorded "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Brewster*, 149 F.3d at 985 (quoting *Loudermill*, 470 U.S. at 546). "An individual must have an opportunity to confront all the evidence adduced against him, in particular that evidence with which the decisionmaker is familiar. *Vanelli*, 667 F.2d at 780.

"A biased proceeding is not a procedurally adequate one." *Clements*, 69 F.3d at 333. "At a minimum, Due Process requires a hearing before an impartial tribunal." *Id.* (citing *Ward v. Village of Monroeville*, 409 U.S. 57, 59-60 (1972)). Due process permits the same administrative *body* to investigate and adjudicate a case as long as the same *person* does not "serve both as decisionmaker and as advocate for the party that benefited from the decision." *Walker v. City of Berkeley*, 951 F.2d 182, 185 (9th Cir. 1991). Additionally, Ninth Circuit law is clear that the decisionmaker in a predeprivation hearing need not be impartial as long as an impartial decisionmaker is provided at the post-termination hearing. *Id.* at 184; *accord Clements*, 69 F.3d at 333 n.15.

A *liberty interest* is implicated if a charge impairs the plaintiff's reputation for honesty or morality. *Vanelli*, 667 F.3d at 777 (emphasis added). "The procedural protections of due process apply if the accuracy of the charge is contested, there is some public disclosure of the charge, and it is made in connection with the termination of employment." *Id.* "If a liberty interest is thereby implicated, the employee must be given an opportunity to refute

12

United States District Court

For the Northern District of California

1  the stigmatizing charge." *Mustafa v. Clark Cty. School Dist.*, 157 F.3d 1169, 1179 (9th Cir.

2  1998).  "Injury to reputation alone is insufficient to establish a deprivation of a liberty

3  interest protected by the Constitution." *Ulrich v. City and County of San Francisco*, 308

4  F.3d 968, 982 (9th Cir. 2002).

5          a.      Property Interest

6          Concerning Zografos' claim that CCSF violated his property interest in his

7  employment, in its opening brief, CCSF argues that its pre-termination process satisfied

8  due process requirements.  It notes that it provided Zografos with a *Skelly* hearing, gave

9  him advanced notice of that hearing, notified him of the charges against him at the hearing

10  and provided the written documents supporting the charges, and gave him an opportunity

11  to respond in writing and to schedule another hearing if he so desired.  It also notes that

12  Zografos in fact responded in writing.

13          As for the post-termination hearing, CCSF asserts that the procedure is set forth in

14  the City's Charter, Civil Service Rules, and the MOU negotiated by Zografos' union.

15  According to the rules and the MOU, Zografos had a right to appeal his termination before

16  a qualified and unbiased hearing officer, and had a right to challenge the competence of

17  the hearing officer if he believed the officer was biased or that prejudice would preclude a

18  fair hearing.  CCSF contends that Zografos abandoned his post-termination appeal, and

19  therefore, cannot state a claim for deprivation of his procedural due process rights.  *Correa*

20  *v. Napa Sch. Dist. No. 131*, 645 F.2d 814, 817 (9th Cir. 1981).

21          Zografos clarifies in his opposition that it is his position that he was denied a

22  meaningful pre-termination hearing, because he was: (1) deprived of key materials and

23  evidence collected by CCSF, and (2) the investigator and hearing officer were biased.

24  Without providing any citations to evidence of record, Zografos argues that CCSF obtained

25  evidence that Morey was the aggressor after Crawley wrote his final investigative report,

26  but failed to provide him with the exculpatory evidence and misled Zografos into believing

27  that no one witnessed the assault.  Zografos also contends that the investigative report was

28                                                      13

United States District Court

For the Northern District of California

biased as pre-ordained by Gee.  He further argues that Gee was both the prosecutor and the judge, having participated in the investigation and having served as the hearing officer. Zografos also implies that the investigator, Sapp, was biased because Zografos had previously testified against and filed a formal complaint against him.

Zografos did not, however, address the issue regarding his waiver or abandonment of the post-termination hearing.

In reply, CCSF contends that Zografos misconstrues the evidence and how much process was due during the pre-termination hearing.  It notes that Zografos was provided with the following procedural due process:

- Zografos was notified in writing of the charges against him more than two weeks prior to the hearing;

- Zografos was notified that CCSF had placed him on administrative leave pending an investigation into the "mistreatment of persons, violence in the workplace, and assault;"

- Zografos was advised that the action taken against him was based on the October 29, 2004 incident;

- Zografos was advised of the charges against him at the November 17, 2004 hearing;

- Zografos was provided with an investigation report and witness statements at the hearing;

- Zografos was given an opportunity to respond to the charges at the hearing;

- Zografos was offered an opportunity to respond in writing after the hearing and to continue the hearing to a later date; and

- Zografos in fact responded in writing after the hearing.

In terms of the alleged bias, CCSF argues that Ninth Circuit law does not require an impartial decisionmaker for a pre-termination hearing.   *Walker*, 951 F.2d at 183.  It further

1   notes that Zografos has not provided any evidence of Gee's alleged bias.

2          Regarding allegedly withheld evidence, CCSF notes that Zografos fails to

3   demonstrate what evidence was withheld.  It asserts that both Gee and Sapp had

4   expressed concern regarding the accuracy of the employee witness statements.  It

5   acknowledges that after the hearing, Gee found out that certain employees had changed

6   their stories, but argues that this discovery following the hearing did not render the pre-

7   termination hearing deficient.  CCSF also explains that the post-hearing evidence did not

8   exonerate Zografos.

9          Furthermore, CCSF notes that in the Ninth Circuit, defective pre-termination

10  hearings can be cured by post-termination due process.  *Walker*, 951 F.2d at 184.  Thus, to

11  the extent there were deficiencies, they may have been cured by a post-termination

12  hearing, but Zografos abandoned his post-termination hearing.  As such, CCSF contends

13  that Zografos also abandoned any claim for deprivation of procedural due process at the

14  pre-termination hearing.  *Correa*, 645 F.2d at 817.

15         At the November 22, 2006 hearing on this motion, Zografos also essentially

16  abandoned his claim of bias, instead contending that it was his position that indeed there

17  was in fact *no* pre-termination hearing.  Zografos argued that because material evidence

18  was withheld, he did not receive a hearing on November 17, 2004.  He contended that at

19  the time of the hearing, defendants gave him a witness statement from his co-worker Al

20  Sangimino, that they knew at the time was false.  Zografos asserts that at the time of the

21  November 17, 2004 hearing, defendants had obtained additional statements from

22  Sangimino that they did not provide to him.

23         The court GRANTS summary judgment in favor of CCSF on Zografos' procedural

24  due process claim based on a property interest for the following reasons.  First and

25  significantly, the claim fails because Zografos received the requisite procedural due

26  process at the pre-termination hearing required by Ninth Circuit law.  *See Brewster*, 149

27  F.3d at 985.  He received notice of the hearing, an explanation of CCSF's evidence, and an

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   opportunity to present his side of the story.  *Id.*  That is all that Ninth Circuit law required.

2   Given the fact that there is plenty of Ninth Circuit law on the issue, there is no need for the

3   court to rely on the out of circuit law cited by Zografos.

4          Zografos' suggestion that CCSF withheld evidence is not borne out by the evidence

5   in this case.  In his opposition, he cited to no evidence in support of his argument that prior

6   to the pre-termination hearing, CCSF obtained exculpatory evidence that it then withheld.

7   *See* Oppos. at 14.  Following questioning by the court at the November 22, 2006 hearing,

8   Zografos pointed the court to Sangimino's declaration, attached to attorney Duckworth's

9   declaration at exhibit J.  Having reviewed the declaration, the court finds that Zografos still

10  has not provided it with any evidence that at the time Gee provided Zografos with

11  Sangimino's witness statement on November 17, 2004, Gee knew that the witness

12  statement was false.  That allegation is simply not supported by the declaration.

13         Moreover, setting aside the fact that Zografos appears to have conceded his bias

14  arguments at the November 22, 2006 hearing,  there are two reasons why these

15  arguments fail.  First, Zografos again has not pointed to sufficient evidence that

16  demonstrates bias because he has not shown that Gee or Sapp served as the

17  "decisionmaker" following the pre-termination hearing.  Second, Zografos waived this claim

18  by abandoning his appeal.  Ninth Circuit law recognizes that even if the pre-termination

19  hearing officer is not impartial, no liability attaches as long as the post-termination appeals

20  adjudicator is impartial.  *See Walker*, 951 F.2d at 185 (holding that "the failure to provide an

21  impartial decisionmaker at the pretermination stage, of itself, does not create liability, so

22  long as the decisionmaker at the post-termination hearing is impartial"); *accord Clements*,

23  69 F.3d at 333 n.15.  Zografos was afforded the opportunity for a post-termination hearing

24  before an impartial judge, Susan Mosk, but waived it.  *See Correa*, 645 F.2d at 817.

25             b.    Liberty Interest

26         Zografos failed to oppose CCSF's motion on this issue, and conceded it at the

27  November 22, 2006 hearing.  Accordingly, defendant's motion is GRANTED on this claim

28
                                          16

as well.

2.    Section 1983:  Substantive Due Process Claim

In its opening brief, CCSF correctly notes that the Ninth Circuit has never resolved the question of whether a discharged public employee can maintain a substantive due process claim based on arbitrary and capricious discharge from employment, *see Portman v. County of Santa Clara*, 995 F.2d 898, 908 (9th Cir. 1993), and that other circuits have rejected such a claim.  *See, e.g., Hill v. Borough of Kutztown*, 455 F.3d 225, 234 n.12 (3rd Cir. 2006); *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994).

However, even if this court were to assume that a right to substantive due process existed, CCSF argues that the evidence demonstrates that Zografos' termination was not arbitrary and capricious.  It notes that reasonable minds may differ as to whether Zografos should have been terminated, but that CCSF had a proper governmental purpose in seeking to reduce workplace violence.  It contends that evidence indicated that Zografos' continued employment may have been inconsistent with that purpose, and his termination was therefore rationally related to that purpose.

In opposition, Zografos argues that CCSF violated his substantive due process rights because it acted arbitrarily and capriciously in its decision to terminate him, and also because it failed to provide him with a safe work environment.

Zografos argues that the Second Circuit and an Oregon district court have recognized such a claim.  *See O'Connor v. Pierson*, 426 F.3d 187, 204 (2d Cir. 2005), *Baynton v. Wyatt*, 411 F.Supp.2d 1223 (D. Or. 2006).  He contends that assuming such an interest exists, CCSF acted in an arbitrary and capricious manner.  He argues that the evidence shows that Morey had a history of violence in addition to harassment with respect to him.  Zografos notes that months before the incident, Morey had threatened him, and that there was evidence that Morey was the aggressor.  Zografos also asserts that he angered management by raising health and safety issues, and that Gee had made up his mind regarding the incident prior to questioning Zografos or other witnesses.

17

United States District Court

For the Northern District of California

1    As for CCSF's alleged failure to provide a safe working environment, Zografos

2    argues that the Ninth Circuit's decision in *L.W. v. Grubbs*, 92 F.3d 894, 896 (9th Cir. 1996)

3    supports recognition of such a constitutional claim.

4    Zografos then contends that CCSF acted with deliberate indifference in failing to

5    protect him from harm.  He notes that he and Haver continually raised concerns regarding

6    their well-being and safety.  He further notes Woods superintendent Williamson's August

7    2004 letter regarding the situation, and requesting a transfer of Morey and Zografos.

8    Zografos also notes that he and Haver met with Gee regarding the harassment.  Zografos

9    contends that CCSF management took no action in spite of their awareness of Morey's

10   prior conviction for felony assault and other infractions.  Zografos asserts that the day

11   before the assault, he alerted his supervisor, Frendo, of Morey's intention to engage

12   Zografos in a fight, but contends that Frendo did nothing.

13   In reply, CCSF correctly asserts that the cases cited by Zografos in favor of

14   recognition of an substantive due process claim based on arbitrary and capricious

15   termination do not actually recognize such a claim.  It notes that the Oregon district court

16   *did not* per se recognize such a claim, but instead simply concluded that it was unwilling to

17   dismiss the claim at the Rule 12(b)(6) stage, and invited the defendant employer to renew

18   the issue at the summary judgment stage.  *See Baynton*, 411 F.Supp.2d at 1226.

19   CCSF also cites to additional circuit decisions that refused to recognize a

20   substantive due process claim under similar circumstances, noting that "extending

21   substantive due process protection would eviscerate the long-standing and well-delineated

22   procedural process protections" and would result in district courts becoming courts of

23   general review for employment decisions.  *See, e.g., McKinney v. Pate*, 20 F.3d 1150,

24   1158-60 (11th Cir. 1983); *Nicholas*, 226 F.3d at 143.

25   As for its alleged failure to provide Zografos with a safe working environment, CCSF

26   argues that Zografos' attempt to federalize the "state created danger" doctrine is not

27   supported by Ninth Circuit law, nor by his complaint (and that it constitutes an entirely new

28

18

United States District Court

For the Northern District of California

theory of relief in this case).  CCSF notes that the state has no affirmative duty to protect persons from violence inflicted by private actors such as Morey, and that the two exceptions recognized by the Ninth Circuit are not applicable here.  *See DeShaney v. Winnebago Cty.*, 489 U.S. 189, 196-97 (1989).  Those two exceptions include (1) "special relationship" exceptions stemming from a custodial relationship between the state and victim; and (2) the "danger creation" exception stemming from "affirmative conduct on the part of the state in placing the plaintiff in danger."  *See L.W. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) ("*Grubbs I*").  A "danger creation" claim requires the plaintiff to demonstrate: (1) affirmative conduct on the part of the state official; (2) that creates a dangerous situation; and (3) that the state official acted with deliberate indifference to the known or obvious danger in subjecting the plaintiff to the dangerous situation.  *L.W. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996) ("*Grubbs II*").

CCSF argues that Zografos cannot establish a "danger creation" claim because the danger was created by Morey in his private capacity, and Zografos cannot point to affirmative conduct by CCSF that proximately caused his injury.  *See Van Ort v. Estate of Stonewich*, 92 F.3d 831, 835-36 (9th Cir. 1996) ("If a government officer does not act within his scope of employment under color of state law, then that government officer acts as a private citizen").  It also argues that CCSF could not have reasonably foreseen that Morey would assault Zografos based on Morey's 30 year-old felony conviction particularly in the absence of other assaults by Morey on co-workers.

CCSF further contends that this case differs from the very few Ninth Circuit cases that have recognized the "state created danger" doctrine.  In all other Ninth Circuit cases, CCSF notes that it was the individual government official whose affirmative conduct caused the harm; whereas, here, Zografos does not seek to hold any CCSF official liable.  *See* Reply at 8.

The court GRANTS CCSF's motion for summary judgment as to this claim.  Even though the Ninth Circuit has not addressed the issue, the majority of circuits to address it

19

United States District Court

For the Northern District of California

1   have concluded in well-reasoned decisions that there is *no* substantive due process claim

2   based on the arbitrary and capricious discharge from employment, and the authority cited

3   by Zografos in support of such a claim is not to the contrary.  In particular, the Second

4   Circuit decision cited by Zografos does not support recognition of such a claim under the

5   circumstances of this case.  In *O'Connor*, the public employer demanded that the plaintiff

6   employee release his medical records and submit to an independent psychiatric exam

7   before being allowed to return to work from an involuntary leave of absence.  426 F.3d at

8   204.  The court held that the employer's demand for private medical records implicated the

9   plaintiff's privacy interests, a "fundamental" interest, and thereby supported a substantive

10  due process claim.  Because of the impact of the medical record request on the *O'Connor*

11  plaintiff's continuing employment, the court found a derivative property-based substantive

12  due process right, but one that was *contingent on proof of a violation of his privacy interest.*

13  *Id.*  Here, no such fundamental interest is implicated.

14          However, even if this court were to recognize the existence of a substantive due

15  process claim under the facts of this case, Zografos cannot demonstrate that CCSF's

16  decision was arbitrary and capricious.  Reasonable minds could differ on the termination

17  decision.  There was evidence before MUNI that went both ways: some suggested

18  Zografos was the aggressor, and other evidence suggested that Morey was the aggressor.

19  MUNI's decision to terminate Zografos in light of its anti-violence policies and the problems

20  that it was having at the Woods facility was not arbitrary and capricious given the fight that

21  occurred on October 29, 2004.

22          Moreover, Zografos' proffered "danger creation" theory fails for two reasons.  First,

23  although Zografos noted at the November 22, 2006 hearing that he was basing this theory

24  on the actions of Buchbinder, Gee, and Crawley, he has not named any of them, let alone

25  *any* state actor, in his complaint.  Second, this theory is undermined by the Ninth Circuit's

26  decision in *Van Ort*, since Morey, a private actor, inflicted the harm on Zografos.  *See* 92

27  F.3d at 835-36. The very arguments that Zografos makes here were rejected by the Ninth

28                                                    20

United States District Court

For the Northern District of California

1  Circuit in *Van Ort.  See id.*

2      3.    Section 1983 Claim:  First Amendment

3      In its opening brief, CCSF correctly noted that in his complaint, Zografos alleged that

4  it retaliated against him "for raising health and safety concerns to management and CAL-

5  OSHA."  CCSF argues that such a claim fails because Zografos' speech did not address

6  matters of public concern, and because Zografos cannot establish a causal link between

7  his allegedly protected speech and his termination.

8      CCSF contends that Zografos' speech addressed neither matters of public concern,

9  nor was it made in his capacity as a citizen.  Instead, it argues that Zografos' complaints

10  regarding employees sleeping on the job and leaving work early, and regarding an

11  unlocked exit door were not protected because they concerned individual personnel

12  disputes and grievances.  It contends that the complaints were not designed to, nor would

13  they provide the public with an evaluation of MUNI's performance.  Moreover, it argues that

14  Zografos' complaints arose from his duties and in his capacity as a city employee,

15  concerned about his personal safety and that of his co-workers, rather than as a citizen.

16      CCSF further contends that the causal link between Zografos' speech and his

17  termination is lacking because none of Zografos' co-workers or supervisors knew that he

18  had complained to OSHA regarding safety issues, and his complaint occurred nearly three

19  years prior to his termination.  It notes that the manager who recommended Zografos'

20  termination had no idea regarding the OSHA complaint until after the decision to terminate

21  Zografos was made.  Finally, CCSF argues that Zografos was terminated based on the

22  fight with Morey, and that CCSF would have taken that action in the absence of his OSHA

23  complaint.

24      Moreover, CCSF argues that Zografos' co-workers' threats did not constitute

25  adverse employment action, and did not occur under color of state law.  According to

26  CCSF, the co-workers' harassment resulted from Zografos' repeated tattling on them

27  regarding sleeping on the job and leaving work early, and the resulting response from

28                                                21

United States District Court
For the Northern District of California

1   management.

2       Finally, CCSF notes that the complaints that Zografos alleges it failed to respond to

3   had nothing to do with Zografos' OSHA complaint, but instead concerned his co-worker's

4   behavior and personal grievances.

5       Zografos failed to address this argument in his opposition, and stated at the

6   November 22, 2006 hearing that he was conceding the claim.  Accordingly, defendant's

7   motion is GRANTED on this claim.

8       4.      *Monell* Liability

9       County and municipal officials, unlike state officials, may be sued for damages in

10  their official as well as their individual capacities.  *See Monell v. New York City*, 436 U.S.

11  658, 691 (1978).  However, section 1983 claims against city or county officials in their

12  official capacities are actually claims against the municipality and are  "subsumed" by

13  *Monell* claims against the municipality.  *See Lewis v. Sacramento Cty*, 98 F.3d 434, 446 (9th

14  Cir. 1996), *reversed on other grounds*, 523 U.S. 833 (1998) (reasoning, based on *Monell*

15  and *Kentucky v. Graham*, 473 U.S. 159 (1985), that claims against city officers in their

16  officials capacities were subsumed by a *Monell* claim against the city)*; accord Berry v.*

17  *Gates*, 2001 WL 849639 at *6 (C.D. Cal. 2001); *see also Graham*,  473 U.S. at 165 & 167

18  n.14 (holding that there is no longer a need to bring official capacity actions against local

19  government officials because under *Monell,* local government units can be sued directly)*;*

20  *Monell*, 436 U.S. at 690 n. 55.

21      Additionally, local government entities are considered "persons" for purposes of

22  section 1983, and can be sued directly for monetary, declaratory, or injunctive relief where

23  "the action that is alleged to be unconstitutional implements or executes a policy statement,

24  ordinance, regulation or decision official adopted and promulgated by that body's officers."

25  *Monell*, 436 U.S. at 690.  However, a municipality "cannot be held liable under § 1983 on a

26  *respondeat superior* theory," that is, "solely because it is a tortfeasor."  *Id.*

27      In order to hold CCSF liable under section 1983, Zografos must show:  (1) that he

28                                      22

possessed a constitutional right of which he was deprived; (2) that the city had a policy; (3) that this policy amount[ed] to deliberate indifference to his constitutional rights; and (4) that the policy is the moving force behind the constitutional violation. *Van Ort*, 92 F.3d at 834 (citing *Canton*, 489 U.S. at 389-91). In other words, in addition to demonstrating a constitutional violation, Zografos must also show that the violation was rooted in a policy or custom directly attributable to CCSF.

*Failure to Supervise/Train*

"A policy can be one of action or inaction." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). A failure to train or supervise can amount to "policy or custom" sufficient to impose liability on CCSF. *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006) (citing *City of Canton*, 489 U.S. 378 (1989)). In *City of Canton*, 489 U.S. 378 (1989), the Supreme Court held that a local government may be liable for constitutional violations resulting from its failure to supervise, monitor, or train, where such inadequacy amounts to deliberate indifference to the rights of the people with whom the local government comes into contact. *See id.* at 388; *see also Van Ort,* 92 F.3d at 835.

"[W]hen the need to remedy the omission 'is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, . . . the policymakers. . . can reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 1195 (quoting *Canton*, 489 U.S. at 390). "The continued adherence by policymakers 'to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." *Anderson*, 442 F.3d at 1186 (quoting *Board of County Commissioners v. Brown*, 520 U.S. 397, 407 (1997)). Although the existence of a policy of deliberate indifference is generally a jury question, a municipality will be entitled to summary judgment where a plaintiff has not demonstrated program-wide inadequacy in training, and has, at best, demonstrated negligence in the training of an individual officer. *See Alexander v. City and County of San Francisco*, 29

23

United States District Court

For the Northern District of California

F.3d 1355, 1367-68 (9th Cir. 1994).

In order to establish that the city's failure to train was the "moving force" behind plaintiff's alleged injury, a plaintiff must show that the alleged deficiency in training or supervision actually caused the violation. *See Gibson*, 290 F.3d at 1196. In other words, plaintiff must show that the violation "would have been avoided" had the city possessed a different training or supervision policy. *See id.* "[T]he existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury.'" *Anderson*, 442 F.3d at 1186 (quoting *Brown*, 520 U.S. at 407-08).

Intervening private actions will preclude municipality liability for alleged negligent supervision. *Van Ort*, 92 F.3d at 837. In *Van Ort*, the Ninth Circuit held that an off-duty officer's "considerable disciplinary record," which included numerous citizen complaints for excessive and improper force and unwarranted violence, in addition to other numerous workplace violations resulting in reprimand, did not make the officer's subsequent assault on plaintiffs forseeable to the county. *Id.* Therefore, the necessary causal link was missing for *Monell* liability. *Id.*; *see also Anderson*, 451 F.3d at 1068 (rejecting plaintiff's argument that there was sufficient causal link where officer who assaulted him had "a reputation for being prone to violence and aggressive behavior").

### Final Policymaker Theory

As noted, there is no *respondeat superior* liability on behalf of a municipality; therefore, the "cases make clear that the unconstitutional discretionary actions of municipal employees generally are not chargeable to a municipality under section 1983." *Id.* (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion) ("[i]f mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability")).

There are two routes to establish municipal liability under this theory. *See Ulrich*,

United States District Court

For the Northern District of California

308 F.3d at 984.  First, a plaintiff may show "that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy' in the area of the decision." *Id.* (quoting *Pembauer*, 475 U.S. at 480-81.  Second, the plaintiff may show that "an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Id.* (quoting *Praprotnik*, 485 U.S. at 126-27).

*Pembauer* requires that an official policymaker make a deliberate choice from among various alternatives to follow a particular course of action.  *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (citing *Pembaur*, 475 U.S. at 483-84).  The authority to exercise discretion while performing certain functions does not make the official a final policymaker unless the decisions are final, unreviewable, and not constrained by the official policies of superiors.  *See Prapotnik*, 485 U.S. at 126-28.

In determining whether an official is a final policymaker for the county, the court must first "identify the particular area or issue for which the official is alleged to be the final policymaker." *Cortez v. County of Los Angeles*, 294 F.3d 1186, 1189 (9th Cir. 2002) (citing *McMillian*, 520 U.S. at 785).  Next, while federal law provides the rules of decision on the ultimate question of whether an official acts for the state or the county, the court must analyze state law to determine the character of an official's function. *See id; see also*, 236 F.3d at 560-61.  Whether an official is a final policymaker is a matter of law determined by the judge rather than the jury, with reference to state law, including the state's constitution, statutes, and case law. *See Brewster v. Shasta County*, 275 F.3d 803, 806 (9th Cir. 2001); *Patel v. Penman*, 103 F.3d 868, 879 (9th Cir. 1996).  Under California law, a city's Charter determines whether an official is a final policymaker. *See Ulrich*, 308 F.3d at 985 (citing *Hyland v. Wonder*, 117 F.3d 405, 414 (9th Cir. 1997).

"*Prapotnik* requires that a policymaker approve a subordinate's decision *and the basis for it* before the policymaker will be deemed to have ratified the subordinate's discretionary decision." *Gilette*, 979 F.2d at 1348 (citing *Prapotnik*, 402 U.S. at 1005).

United States District Court

For the Northern District of California

1    In its opening brief, CCSF notes that Zografos identified in his discovery a series of

2    specific actions taken against him by MUNI supervisors and co-workers as evidence of

3    *Monell* liability, and that he identified specifically MUNI managers such as Gee, Ware,

4    Sapp, Andrich, and Buchbinder.  Zografos did not identify the city's Civil Service

5    Commission ("CSC"), though.

6    CCSF argues that it is not liable under section 1983 because the CSC is the final

7    policymaker with respect to employment matters in San Francisco, and the decision to

8    terminate Zografos' employment cannot be attributed to the CSC.  CCSF contends that its

9    Charter provides that the CSC is the final policymaker on employment issues.   *See*

10   Charter at sect. 10.100, 10.101; CSC Rules 103, 104, 122, 422.  Nevertheless, CCSF

11   concedes that if the CSC were to delegate final policymaking authority to a department

12   head or were to ratify an unconstitutional policy, it could be held liable under *Monell.*

13   It contends, though, that there has been no such ratification or delegation of

14   authority by the CSC in this case.  It implies that the language of the Charter prevented

15   delegation.  It further argues that Zografos cannot show that the CSC, MUNI, or even the

16   MUNI managers ratified the conduct of Zografos' co-workers.  Instead, it argues that CCSF

17   took numerous steps in the form of training programs, replacing the supervisor, and

18   discipline.

19   Finally, CCSF contends that there was no longstanding policy or custom of

20   constitutional violations.

21   In opposition, Zografos argues two theories for *Monell* liability: (1) a custom and

22   practice of management employees failing and refusing to take corrective action when an

23   employee complained about harassment; and (2) liability based on the final decisionmaker

24   theory.

25   Zografos' custom argument is similar to that described above in the legal standards

26   regarding negligent training and supervision.  Zografos argues that both he and Haver

27   complained on numerous occasions regarding harassment, but that nothing was done.  He

28

1  contends that management ignored pleas from the Woods facility's superintendent,

2  Williamson, to take corrective action.  He asserts that the systemic harassment is sufficient

3  under *Monell*.

4          As for the final policymaker theory, Zografos contends that Buchbinder, the human

5  resources director, was the final decisionmaker and the person ultimately responsible for

6  Zografos' termination.  He contends that Buchbinder also knew of the harassment, but

7  failed to take corrective actions.  Alternatively, Zografos argues that Buchbinder delegated

8  policymaking authority and/or ratified Gee's termination decision.

9          In reply, CCSF spends a fair amount of time addressing both of Zografos' arguments

10  regarding the bases for *Monell* liability.  First, it contends that *none* of the employees

11  mentioned by Zografos had final policymaking authority regarding employment issues –

12  including Buchbinder, Gee, and Hursh.  It notes that there is a distinction under *Monell*

13  between a final *policymaker* and a final *decisionmaker.*  CCSF also notes that Zografos has

14  cited no facts or law to show that Buchbinder, Gee, and/or Hursh were final *policymakers* or

15  were delegated such authority.  Instead, Zografos urges the court to ignore the Charter and

16  sources of local law.

17          CCSF does not dispute that Buchbinder, Gee, and Hursh have the authority to make

18  certain decisions regarding MUNI.  However, it argues this decisionmaking authority is not

19  enough, and cites to *Pembaur*, in which the plurality concluded that "the County Sheriff

20  may have discretion to hire and fire employees without also being the county official

21  responsible for establishing county employment policy."  475 U.S. at 483 n.12.  CCSF also

22  cites to *Prapotnik*, and notes that the plurality in that case held that the Civil Service

23  Commission – and not the Community Development Agency – was the final policymaker

24  with respect to personnel matters, notwithstanding the fact that the Community

25  Development Agency had broad power to manage its own affairs, including personnel

26  decisions.  485 U.S. at 129-30.  The plurality reasoned that the CSC in *Prapotnik* was still

27  the final policymaker even though it had given the Community Development Agency the

28

United States District Court

For the Northern District of California

1  discretion to hire and fire employees.  *Id.* at 130.

2       CCSF also points to the Ninth Circuit's decision in *Gillette* in support of its argument

3  that Buchbinder, Gee, and Hursh were not final policymakers.  979 F.2d at 1344-45.  It

4  notes that in *Gillette,* the plaintiff firefighter claimed retaliatory discharge at the hands of

5  several fire department officials, including the fire chief.  *Id.*  The *Gillette* plaintiff argued

6  that the fire chief "had final authority with respect to disciplining the firefighters and had

7  been delegated *de facto* authority to establish personnel policy within the Fire Department."

8  *Id.* at 1349.  The Ninth Circuit rejected the argument, and held that "municipal liability could

9  be imposed on the basis of [the fire chief's] actions only if he was responsible for

10  establishing the city's employment policy."  *Id.* at 1350.  Because the City Charter did not

11  give the fire chief such responsibility, there was no *Monell* liability.

12       CCSF also contends that Zografos cannot establish a widespread custom, but

13  instead presents a very limited picture.  It notes that MUNI had policies prohibiting

14  workplace harassment and violence generally, and, specifically, took action in response to

15  Zografos' complaints, including the following:

16       •    Ware, the Woods superintendent, investigated Zografos' March 2003

17            complaint, met with the employees involved, and resolved the matter;

18       •    Ware removed the unit supervisor, Frendo, based on Frendo's inability

19            or unwillingness to address conflict within the shop;

20       •    CCSF disciplined Morey with a verbal warning in 2004 for namecalling;

21       •    Andrich, a unit supervisor, considered Zografos' January 2004

22            complaint against Lopez, but was unable to determine what happened.

23            Zografos admits there was no further harassment from Lopez;

24       •    Williamson moved his office in July 2004 to better monitor employee

25            conduct;

26       •    Williamson intervened in and reprimanded both Zografos and Morey in

27            an August 2004 shouting match; and

28                                              28

United States District Court

For the Northern District of California

1          •    Gee and Ware arranged for MUNI's EEO section to conduct several

2               training programs in 2003 to address employee conflict.

3          CCSF also argues that Zografos cannot show a sufficient causal link between the

4    alleged policy of failure to correct harassment and his injury.  CCSF notes that Zografos

5    has alleged that the custom or policy is "failing and refusing to take corrective action when

6    an employee complained about harassment."  However, it notes that Zografos then claims

7    that he was injured when CCSF failed to provide him with procedural due process after the

8    assault.  It contends that there is no causal link between Zografos' injury and the alleged

9    custom or policy, and further notes Morey's intervening role.

10         First, because Zografos cannot establish an underlying constitutional deprivation as

11   to any of his section 1983 claims, he cannot establish *Monell* liability for CCSF.  *See Van*

12   *Ort*, 92 F.3d at 834.

13         However, even if he were able to establish a constitutional violation, his *Monell* claim

14   fails on the merits.  Zografos' first proffered basis for *Monell* liability –  the final policymaker

15   theory – fails because Zografos has not named in his complaint any city officials who acted

16   as final policymakers in this case.  However, even if he had, there could be no liability

17   because the city's Charter and the evidence in this case clearly demonstrate that while

18   Gee, Hursh, and Buchbinder may have been the final decisionmakers, they were not the

19   final *policy*makers.  Zografos simply has not pointed to any evidence indicating that the

20   CSC either delegated its authority to the individuals or ratified their decisions.

21         Regarding MUNI's alleged policy of inaction with respect to harassment, this theory

22   also fails because the evidence demonstrates to the contrary.  The evidence reveals that

23   Woods was a tense, hostile place to work given the cliques that existed and the personality

24   conflicts amongst its employees.  However, the evidence also shows that MUNI's *policy*

25   was to attempt to redress the harassment.  Zografos simply cannot show that the city's

26   response to the harassment was the "moving force" behind his injury.  *See Gibson*, 290

27   F.3d at 1196.  Moreover, per the Ninth Circuit's decision in *Van Ort*, Morey's intervening

28                                          29

United States District Court

For the Northern District of California

1    private actions preclude liability under *Monell.*  92 F.3d at 837.

2         5.    State Law Claims

3         In its opening motion, CCSF argues that Zografos' four state law tort claims are all

4    barred by the exclusive remedy provision of the California's Worker's Compensation Act.

5    *See* Cal. Labor Coder § 3600 *et seq.*  It contends that Zografos' claims for intentional and

6    negligent infliction of emotional distress, negligent retention, and negligent supervision

7    arise from conduct that is a normal part of the employment relationship – in particular, the

8    city's supervision of its workforce.  Therefore, CCSF argues that it was within the normal

9    risks of employment, and workers compensation is the only remedy.  *Shoemaker v. Myers*,

10   52 Cal.3d 1 (Cal. 1990); *Vacanti v. State Compensation Ins. Fund*, 24 Cal.4th 800 (Cal.

11   2001).

12        Zografos argues his claims are not preempted because he asserts personal injury

13   claims that implicate fundamental public policy considerations.  *See Maynard v. City of San*

14   *Jose*, 37 F.3d 1396, 1405 (9th Cir. 1994).  Zografos contends that his assertion of health

15   and safety issues at work resulted in his injuries, and that the assertion of such issues is

16   recognized as a fundamental public policy by California law.  *Skillsky v. Lucky Stores, Inc.*,

17   893 F.2d 1088, 1093 (9th Cir. 1990).

18        In reply, CCSF contends that in order for a plaintiff to qualify for the exception to

19   workers compensation exclusivity based on violations of fundamental public policy, the

20   plaintiff must have a viable tortious discharge claim.  *Gannt v. Sentry Insur.*, 1 Cal.4th

21   1083, 1097-1101 (Cal. 1992); *Maynard*, 37 F.3d at 1405-06.  However, Zografos dismissed

22   his claim for wrongful termination in violation of public policy on October 10, 2006.

23   Accordingly, it argues that the state law claims represent nothing beyond the normal risks

24   of employment.  *Vacanti*, 24 Cal.4th at 800.

25        The court agrees that Zografos' claims based on CCSF's negligence, including

26   those for negligent infliction of emotional distress, negligent supervision, and negligent

27   retention, are all part of the normal risks of employment, and are therefore barred by the

28                                        30

workers compensation exclusivity provisions.  *See Shoemaker*, 52 Cal.3d at 1; *Vacanti*, 24 Cal.4th at 800.  However, at the November 22, 2006 hearing, the court sought clarification regarding Zografos' claim for intentional infliction of emotional distress.

Zografos responded that his intentional infliction claim qualifies for the fundamental public policy exception because CCSF retaliated against him based on his protected speech, the health and safety complaints.  CCSF reiterated its position that once Zografos' section 1983 claims fail, and given his dismissal of the wrongful termination claim, the intentional infliction of emotional distress claim must fail as well.  It argues that Zografos cannot simply concede his section 1983 claim based on the First Amendment issues, as he has done, and his wrongful termination claim, and then revive them via an intentional infliction of emotional distress claim in order to escape the workers compensation exclusivity provisions.

However, having reviewed the authority cited by CCSF in support of this position, the court is not persuaded that CCSF is entitled to judgment on Zografos' claim for intentional infliction of emotional distress, and DENIES CCSF's motion as to this state law claim.

The court has not yet determined whether it will exercise or decline to exercise supplemental jurisdiction over Zografos' sole surviving state law claim against CCSF.  *See Ove v. Gwinn*, 264 F.3d 817, 826 (9th Cir. 2001).  It is currently considering whether this single state law claim should be remanded, but would prefer, if a remand is the appropriate result, not to remand piecemeal.  As Zografos' claims against Morey are outstanding, and as it is not clear whether a federal claim against Morey is viable, in a related order, the court has set this matter for a case management conference before pretrial practice begins, with all parties to be present.

6.      Zografos' Objections to Evidence

The court OVERRULES Zografos' objections to CCSF's evidence.

31

**CONCLUSION**

For the reasons set forth above, the court GRANTS CCSF's motion for summary judgment as to the section 1983 claims and as to the state law claims for negligent infliction of emotional distress, negligent retention, and negligent supervision.  The court DENIES CCSF's motion for summary judgment as to Zografos' claim for intentional infliction of emotional distress.

Dated: December 13, 2006

**IT IS SO ORDERED.**

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
For the Northern District of California

32